**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALONZO DANIEL JONES,** | : | **Civil No.  1:19-CV-1940** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

For Administrative Law Judges (ALJs), Social Security disability determinations frequently entail an informed assessment of competing medical opinions coupled with an evaluation of a claimant's subjective complaints. Once the ALJ completes this task, on appeal it is the duty and responsibility of the district court to review these ALJ findings, judging the findings against a deferential standard of review which simply asks whether the ALJ's decision is supported by substantial evidence in the record,  see 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012), a quantum of proof which "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

1

mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).

In the instant case, an ALJ denied a disability application submitted by Alonzo Jones. Jones now appeals the ALJ's denial of his disability application, in which the ALJ found that Jones could perform a range of medium work with some additional functional and environmental limitations. Specifically, the ALJ found that, although Jones suffers from vision loss in one eye, severe migraines and a seizure disorder, which have caused him to have major seizures or "black out" at least four times per month, Jones could perform medium work. After a review of the record, including the extensive medical history of the plaintiff's seizure disorder, we find that the ALJ's RFC determination is not supported by substantial evidence. Accordingly, we recommend that this case be remanded for further consideration.

## II. **Factual Background**

### A. **Jones' Medical History**

Mr. Jones filed for supplemental security income on November 17, 2016. (Tr. 20). He was 39 years old as of the amended alleged onset date of November 17, 2016, had a tenth-grade education and no relevant past work. (Tr. 26). Jones alleged impairments of seizures, headaches, back pain, and blindness in his left eye. (Tr. 78).

Jones has complained of and was treated for migraine headaches and a seizure disorder for the past thirty years since the age of 8 years old, after he was in a motor vehicle accident that put him in a week-long coma. Thus, in addition to treatment he received outside of the relevant time period for this appeal, Jones was treated by Dr. Jiang, M.D., at WellSpan Neurology in February of 2017. Dr. Jiang noted that Jones had a history of traumatic brain injury from a motor vehicle accident when he was eight years old, and he was complaining of more frequent seizure symptoms. (Tr. 434). Dr. Jiang renewed Jones' prescription seizure medications and recommended he schedule a routine EEG. (Tr. 437). He also cautioned that Jones should not drive a vehicle. (Id.) In addition, on February 8, 2017, Jones presented to York Hospital, where it was noted that he had a past medical history of seizures. (Tr. 448).

On May 8, 2018, Dr. Spencer Long, M.D., performed an internal medicine examination of Jones. (Tr. 422). Dr. Long noted that Jones had a history of traumatic brain injury, beginning with a motor vehicle accident when he was eight years old. (Id.) Jones had fallen out of a tree a few years later, and then in 2002, sustained a gunshot wound to the head. (Id.) Jones' seizures began after the motor vehicle accident and were occurring about three times per week, and it was noted that he experienced migraine headaches about once per month, which lasted anywhere from a few hours to a full day. (Id.) Dr. Long opined that Jones was totally blind in his

3

left eye, and diagnosed him with seizures, lower back pain, migraine headaches, and hypertension. (Tr. 424-25). Jones' reported activities of daily living included some cooking and cleaning, as well as reading and socializing. (Tr. 423).

Jones again presented to York Hospital on May 26, 2017 after he had a seizure. (Tr. 457). It was noted that Jones was having approximately four seizures per week, and that he was compliant with at least one of his seizure medications. (Id.) He also complained of a mild headache and was treated with Tylenol. (Tr. 460). Jones then underwent a scheduled EEG with Dr. Jiang on June 9, 2017. (Tr. 463). While the findings were largely normal, Dr. Jiang noted that "[a] normal study does not rule out the diagnosis of seizure disorder." (Id.)

Jones followed up with Dr. Jiang in June of 2017, where Dr. Jiang noted that Jones' headaches and seizures were worsening. (Tr. 439). Dr. Jiang noted that he was concerned that Jones was having more seizures than he was aware of, and again recommended he schedule a routine EEG. (Tr. 440). WellSpan records indicate that Jones reported having about three seizures per month, sometimes more, and that he felt morning sickness on a daily basis. (Id.) Dr. Jiang noted that Jones' headaches were severe, mostly occurring on his left side and lasting four hours up to a day long. (Id.)

4

Jones was admitted to York Hospital again in September 2017 after having a seizure. (Tr. 465). It was noted that Jones had a headache, as he usually did with his seizures, as well as nausea. (Tr. 465-66). Jones was treated for his headache, treatment which was also aimed at lowering his blood pressure, and he got a CT scan. (Tr. 467, 469).

During this time, Jones also treated with his primary care physician, Dr. Walter Krajewski, D.O. A treatment note from October 25, 2016 indicated that Jones was having 2-3 seizures, but that he had no other symptoms. (Tr. 498). In April 2017 at his six-month checkup, it was noted that Jones had been feeling sick and nauseous, but that his medications would remain the same. (Tr. 497). Treatment notes from May 2017 indicate that Jones followed up with Dr. Krajewski after his hospital visit. It was noted that Jones had a seizure and that he was feeling ill every morning. (Tr. 496).

Jones was seen at Memorial Hospital in January 2018 after he suffered a seizure. (Tr. 478). He followed up with Dr. Krajewski on January 31, 2018. Dr. Krajewski noted that Jones was experiencing 3-4 seizures per month. (Tr. 494). It was also noted that Jones was getting sick before his seizures and was very tired following a seizure. (Id.) In July 2018, Dr. Krajewski stated that Jones had experienced ongoing seizures since his brain injury in 1984, and that his condition

5

was permanent, had not improved, and was not expected to improve. (Tr. 489). Dr. Krajewski noted that Jones had 2-4 seizures per month, and that his seizure disorder was poorly controlled, despite interventions by Neurology. (Id.)

Jones testified at the disability hearing held on his application on July 23, 2018. (Tr. 33-76). Jones testified that his last seizure had been one day before the hearing. (Tr. 38). He explained to the ALJ that he largely "blacks out" when he has a seizure, as opposed to a more severe grand mal seizure. (Tr. 39). However, he did testify that he was hospitalized in January of 2018. (Id.) He also testified to an incident in which he fell down the stairs because he had blacked out at the top of the steps. (Tr. 48). Jones also testified that he experienced severe migraine headaches that usually lasted a few hours but could last an entire day. (Tr. 43, 49). He explained that his migraine pain was largely confined to his left side, where he had been shot in the face. (Tr. 51). As to the frequency of his seizures, Jones testified that he had several small seizures per month, in which he would "black out," and that he also had one major seizure per month. (Tr. 60).

Jones also testified that he had high blood pressure, which triggered his seizures. (Tr. 55). He stated that he could feel it coming on because he got nauseous, and he would then try to find a cool place to lay down. (Tr 55-56). As for his activities of daily living, Jones testified that he helped his mom with small chores

6

around the house, but that she would not allow him to cook because of his black outs and seizures. (Tr. 52, 58). He also explained that he did not have a driver's license because his doctor had advised him it was too dangerous for him to drive. (Tr. 53). He stated that he went fishing with his cousin to relax. (Tr. 54).

An impartial Vocational Expert also testified at the hearing. The ALJ posed a hypothetical to the VE, which included some postural and environmental limitations:

> [C]onsider an individual of the same age, education past as the claimant, who is capable of lifting and or carrying 50 pounds occasionally, 25 pounds frequently. Can sit, stand or walk six hours each, per eight hour day. No postural except the following. Occasional ramps and stairs, occasional balance, no ladders, ropes or scaffolds. Occasional near acuity on the left. Occasional far acuity on the left. Bilateral occasional depth perception . . . Occasional left field of vision. No exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, dust, gases, odors, poor ventilation, unprotected heights, moving machinery parts. No driving. SCO levels no greater than three.

(Tr. 70-71). The VE stated that there were several medium-work jobs that existed in the national economy that fit these criteria. (Tr. 72). However, when asked if the same individual would be off task for more than 15% of the day, the VE stated that there would be no jobs in the national economy. (Id.) The VE also opined that if an individual required more than the typical number of breaks allowed by most employers, it would have an impact on the individual's employability. (Tr. 73).

## B. **The ALJ's Decision**

Jones applied for supplemental security income on November 17, 2016 and alleged an amended onset date of November 17, 2016. His initial application for benefits was denied on May 17, 2017. (Tr. 15.) Thereafter, Jones requested a hearing, and a hearing was held on July 23, 2018. (Id.) At the hearing, both Jones and a Vocational Expert testified. (Id.) By a decision dated October 23, 2018, the ALJ denied Jones' application for benefits.

At the outset, the ALJ first concluded that Jones had not engaged in any substantial gainful activity since his alleged onset date of disability, November 17, 2016. (Tr. 22). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Jones had the following severe impairments: epilepsy, migraines, hypertension, and left eye diminished vision. (Id.) The ALJ found that the plaintiff's lower back pain was a nonsevere impairment. (Id.) At Step 3, the ALJ found that none of Jones' impairments met or medically equaled a listed impairment. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functioning capacity ("RFC"), taking into account Jones' limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functioning capacity to perform medium work as defined in 20 CFR 416.967(c) and he can occasionally balance or climb ramps and stairs and cannot climb ladders, ropes, or

scaffolds. He can occasionally perform near left acuity, far left acuity, left field of vision, and bilateral depth perception. He cannot be exposed to extreme cold, extreme heat, wetness, humidity, vibration, fumes, dust, gases, odors, poor ventilation, unprotected heights, moving machinery parts, driving, or SCO noise level greater than three.

(Tr. 23).

Specifically, in making this RFC determination, the ALJ gave great weight to the May 2017 opinion of Dr. Parmelee, a non-treating, non-examining state agency doctor. (Tr. 25, 94-96). Based upon a review of medical records, Dr. Parmelee opined that Jones could perform medium exertional work with some postural and environmental limitations. (Tr. 25). Thus, Dr. Parmelee found that Jones could lift and carry 50 pounds occasionally and 25 pounds frequently; could stand, walk and sit for 6 hours in an 8 hour day; could occasionally climb ramps and stairs and balance, but never climb ladders, ropes or scaffolds. (Tr. 94-95). Dr. Parmelee also found that Jones' field of vision, his near and far left acuity, and depth perception were all limited due to his eye injury. (Tr. 95). Further, the environmental limitations included avoiding concentrated exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Id.) However, the ALJ imposed more strict environmental limitations than Dr. Parmelee found to be necessary, limiting him to no exposure to those environmental elements. (Tr. 25).

9

Notably, Dr. Parmalee's medical record review took place in May of 2017. (Tr. 94-96). Thus, the doctor's opinion did not, and could not, take into account subsequent material medical developments like Dr. Jiang's treatment notes or the findings from Jones' June 20, 2017, September 12, 2017 and January 16, 2018 hospitalizations

The ALJ also considered the opinion of Dr. Long and gave this opinion little weight. (Tr. 25-26). Dr. Long performed an internal medicine examination and diagnosed Jones with seizures, lower back pain, left eye blindness, migraine headaches, and hypertension. (Tr. 425). Dr. Long found that Jones was totally blind in his left eye, that left eye did not respond to light, and that his visual fields to confrontation were absent on the left. (Tr. 424). In terms of postural limitations, Dr. Long found that Jones could lift up to 50 pounds occasionally, up to 20 pounds frequently, and up to 10 pounds continuously; that he could sit and stand 30 minutes at one time without interruption, could stand for 90 minutes total in an 8 hour workday, and could walk 2 hours in an 8 hour workday. (Tr. 426-47). Dr. Long also opined that Jones could occasionally climb ladders or scaffolds, and he could frequently climb stairs and ropes, balance, stoop, kneel, crouch and crawl. (Tr. 429). The ALJ found that Dr. Long's opinion was inconsistent with his examination of Jones, which revealed a normal gait, normal heart rate, full strength, and no muscle

10

atrophy. (Tr. 26). The ALJ also found that this opinion was inconsistent with the claimant's activities of daily living. (Id.)

Finally, the ALJ considered the statement of Dr. Krajewski, the plaintiff's primary care physician. (Tr. 26). This statement opined that Jones' seizure disorder was permanent and would not improve. (Tr. 489). Dr. Krajewski opined that Jones' seizure disorder was not well controlled, despite intervention by Neurology, and that Jones averages about 2 to 4 seizures per month. (Id.) The ALJ gave Dr. Krajewski's statement little weight, reasoning that this statement was inconsistent with Dr. Krajewski's progress notes that showed Jones had no focal deficits. (Tr. 26). The ALJ also reasoned that this statement was inconsistent with Jones' activities of daily living. (Id.)

The ALJ also considered the claimant's subjective complaints, but ultimately concluded that Jones' statements about the intensity, persistence, and limiting effects of his impairments were not consistent with the medical evidence. (Tr. 24). On this score, Jones alleged that he could not work because he experienced at least three seizures per month, including one grand mal seizure, and that he experienced migraines that lasted for several hours up to a full day. (Tr. 24). The ALJ concluded that Jones' allegations were inconsistent with the medical record. The ALJ reasoned that treatment notes generally indicated that Jones was fully alert and oriented and

had no focal neurological deficits. (Id.) He also reasoned that Jones intermittently took his medications, and that his statements were inconsistent with his activities of daily living. (Id.) Notably, this reasoning did not include any discussion of Jones' three hospitalizations in 2017 and one in 2018 for major seizures.

As to his left eye blindness, the ALJ found Jones' statements to be inconsistent with the medical evidence because he had received minimal treatment for his vision. (Tr. 25). The ALJ reasoned that the May 2017 consultative examination showed that Jones had 20/25 vision in his right eye. (Id.) He also reasoned that Jones' statements regarding his vision were inconsistent with his activities of daily living, which included mowing his mother's small yard, reading, socializing and fishing. (Id.)

Thus, at Step 4, the ALJ found that Jones had no past relevant work but found at Step 5 that there were jobs in the national economy that Jones could perform, including a dining room attendant, egg packer, and bakery racker. (Tr. 26-27). The Vocational Expert testified that this work was medium, unskilled work with an SVP of 1 or 2. (Tr. 27). Accordingly, the ALJ determined that Jones was not disabled and denied his claim for benefits. (Id.) Jones requested a review of the ALJ's decision, which was denied by the Appeals Council. (Tr. 1-3.) This appeal followed. (Doc. 1.)

On appeal, Jones contends that the ALJ's decision is not based on substantial evidence as required under 42 U.S.C. § 405(g) because the ALJ mischaracterized

the evidenced and gave little weight to the medical opinion and evidence provided by his treating physician, Dr. Krajewski. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will remand this appeal for further consideration.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be

13

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence." )(alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must

14

not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

15

**B.**     <u>**Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**</u>

To receive benefits under the Title II of the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe

16

impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a

decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the

commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in

19

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

**C.**     **<u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion
Evidence</u>**

The Commissioner's regulations also set standards for the evaluation of
medical evidence and define medical opinions as "statements from acceptable
medical sources that reflect judgments about the nature and severity of [the
plaintiff's] impairments, including [the plaintiff's] symptoms, diagnosis and
prognosis, what [he or she] can still do despite impairments, and [the plaintiff's]
physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Regardless of its
source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §
404.1527(c).

In deciding what weight to accord to competing medical opinions and
evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The
regulations provide progressively more rigorous tests for weighing opinions as the
ties between the source of the opinion and the individual become weaker." SSR 96-
6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant,
and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §
404.1527(c)(2) ("Generally, we give more weight to opinions from your treating
sources..."); 20 C.F.R. § 404.1502 (defining treating source). Under some
circumstances, the medical opinion of a treating source may even be entitled to
controlling weight. 20 C.F.R. § 404.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL

374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. However, 20 C.F.R. § 404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by non-examining state agency medical and psychological consultants should be

evaluated as medical opinion evidence. Therefore, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by state agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or state agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate,

articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

On this score, as we have also noted:

> However, case law also cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *7 (M.D. Pa. June 1, 2020).

## D.    This Case Will Be Remanded for Further Consideration and Articulation of the Grounds for the ALJ's Decision.

As we have noted, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. This cardinal principle applies with particular force to several types of assessment made by ALJs. First, it is well-settled that "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity."

24

Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). Therefore, an ALJ must "explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). Second, with respect to an ALJ's assessment of medical opinion evidence, it is clear that "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer, 186 F.3d at 429)). Instead, as a general rule, "[I]t is well established that the opinions of a doctor who has never examined a patient 'have less probative force as a general matter, than they would have had if the doctor had treated or examined him.' " Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000). Further, when an ALJ's decision to credit the opinion of a non-examining source over the opinions of examining and treating physicians rests upon some factual or logical errors, then at a minimum a remand is necessary. Brownawell v. Comm'r Of Soc. Sec., 554 F.3d 352, 358 (3d Cir. 2008).

In the instant case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation. As we have explained, the ALJ found that Jones could perform a range of medium work with some postural and environmental

limitations. In doing so, the ALJ gave great weight to the consultative examiner, Dr. Parmelee, and gave little weight to Dr. Krajewski, the plaintiff's treating physician. However, after a review of the record, we find that the ALJ's reasoning for the weight assigned to these opinions is not supported by substantial evidence.

On this score, the ALJ did not give an adequate explanation for affording Dr. Parmelee's opinion more weight than Jones' treating physician. Dr. Parmelee was a non-treating and non-examining source who opined based upon a medical records review in May 2017, that the plaintiff could perform medium work with limitations. The ALJ reasoned that Dr. Parmelee's examination was consistent with the longitudinal treatment notes showing that Jones had no neurological deficits.

However, there are several problems with this conclusion. First, this opinion was rendered in May 2017, months before the plaintiff was hospitalized twice for major seizures in September 2017 and January 2018. The failure to account for this after-acquired evidence undermined the ALJ's decision to give Dr. Parmalee's opinion great weight, a fact which is noted by the ALJ. Simply put, it cannot be said that this non-examining source opinion was consistent with the longitudinal record when that longitudinal record reveals multiple hospitalizations related to Jones' seizure disorder *after* this opinion was rendered. Moreover, the treatment notes after May 2017 from both Dr. Krajewski and Dr. Jiang indicate Jones' seizure disorder

was longstanding, intractable, spanned decades and may have been worsening. Indeed, when one considers the longitudinal picture in Jones' case, for more than three decades it appears that this picture has been marked by recurrent significant seizures. It is, therefore, difficult to reconcile Dr. Parmalee's relatively benign opinion with this longstanding longitudinal picture.

In any event, the ALJ did not articulate an explanation for why he gave Dr. Parmelee's May 2017 great weight but discounted the treatment notes from Dr. Krajewski and Dr. Jiang. In our view, more is needed here. Further, the ALJ did not explain the reason for discounting the treatment records of Dr. Krajewski and Dr. Jiang, which indicated that the plaintiff had a long history of seizure disorder, and that this seizure disorder was worsening throughout 2017 and into 2018. Dr. Krajewski's notes state that Jones was having multiple seizures per month, and that he was hospitalized four times after suffering more severe seizures. Notably, the ALJ's opinion does not entail any discussion about the plaintiff's four hospitalizations for major seizures. In fact, the decision largely discounts the treatment notes from Dr. Jiang and Dr. Krajewski, both of whom treated the plaintiff for his seizure disorder during the relevant time period. Instead, the ALJ focused solely on the fact that these treatment notes indicated the plaintiff was generally alert and fully oriented. This simply is not an adequate explanation for discounting the

two years of treatment notes from these providers, which indicate that the plaintiff has long suffered from multiple seizures per month, as well as severe migraine headaches and high blood pressure, which was noted to be a possible cause of his seizures.

In fact, the ALJ's focus upon Jones' gait, his alertness during examinations, and his activities of daily living misses the larger issue that arises in seizure-based disability claims. Seizure disorders are profound but episodic. A person who suffers from a severe seizure disorder often functions well until the onset of these seizures when he is unable to function at all. Therefore, focussing on how Jones functions when he is not experiencing a seizure sheds little light on the degree to which his recurrent seizures would be disabling in the workplace.

Given this medical evidence, we conclude that the ALJ did not adequately explain how the plaintiff could perform a range of medium work given his reported 30-year history of seizure disorder and migraines. As we have noted, the ALJ's determination seems to assume that the plaintiff's multiple seizures per month would not interfere with his ability to perform these jobs, an assumption that is largely contradicted by the medical evidence. Additionally, nothing in the RFC accounts for the potential of frequent, sudden absenteeism from work when Jones suffers from the seizures that have allegedly plagued him for the past three decades. Indeed, the

28

medical evidence suggests that Jones experiences severe migraines, and that he suffers from multiple seizures per month and experiences extreme fatigue after a seizure. Moreover, on four occasions when Jones suffered a major seizure, he was admitted to the hospital for treatment. Many of these hospitalizations occurred after the state agency medical record assessment conducted by Dr. Parmelee in May of 2017. These multiple hospitalizations are material intervening medical events which reduce the reliance which can be placed on Dr. Parmalee's opinion.

Where a non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016). As a matter of law and common sense, material medical developments which take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in this non-treating and non-examining source opinion. Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003). In short, it is well-recognized that:

> It can be inappropriate for an ALJ to rely on a medical opinion that was issued prior to the close of the period of claimed disability, particularly if a claimant's medical condition changes significantly after the opinion is issued. See, e.g., Alley v. Astrue, 862 F. Supp. 2d 352, 366 (D. Del. 2012); Morris v. Astrue, Civ. Action No. 10–414–LPS–CJB, 2012 WL 769479, at *24 (Mar. 9, 2012). However, when

a state agency physician renders an RFC assessment prior to a hearing, the ALJ may rely on the RFC [only] if it is supported by the record as a whole, including evidence that accrued after the assessment. See, e.g., Pollace v. Astrue, Civil Action No. 06–05156, 2008 WL 370590, at *6 (E.D. Pa. Feb. 6, 2008); see also Johnson v. Comm'r of Soc. Sec., Civil No. 11–1268 (JRT/SER), 2012 WL 4328389, at *9 n. 13 (D. Minn. Sept. 20, 2012); Tyree v. Astrue, No. 3:09–1091, 2010 WL 2650315, at *4 (M.D. Tenn. June 28, 2010).

Smith v. Astrue, 961 F. Supp. 2d 620, 644 (D. Del. 2013).

Applying these legal benchmarks, courts have frequently remanded cases for further consideration by the Commissioner when great reliance is placed upon early non-treating or non-examining source opinions, without adequate examination of the degree to which subsequent medical developments undermined those opinions. See e.g., McArthur v. Berryhill, No. 1:17-CV-2076, 2019 WL 1051200, at * 7 (M.D. Pa. Jan. 30, 2019), report and recommendation adopted, No. 1:17-CV-2076, 2019 WL 1040673 (M.D. Pa. Mar. 5, 2019); Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at * 9 (M.D. Pa. Mar. 2, 2018); Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at * 9 (M.D. Pa. June 1, 2020).

So it is here. The ALJ's reliance upon a non-examining state agency doctor's opinion which necessarily failed to take into account multiple subsequent medical encounters related to Jones' seizure disorder to discount treating source opinions is not adequately explained. Nor does the ALJ's decision address in a meaningful way the impact of what are described as multiple seizures Jones experiences on a monthly

basis on his ability to work. Thus, the determination that Jones could perform medium work is not supported by substantial evidence. Accordingly, we will remand this case to the ALJ for further evaluation, development, and assessment of the medical record.

Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

March 29, 2021